# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT JACKSON

### SEPTEMBER SESSION, 1998



**FILED**

**January 8, 1999**

**Cecil Crowson, Jr.**
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 02C01-9707-CR-00286** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **SHELBY COUNTY** |
| **VS.** | ) | |
| | ) | **HON. ARTHUR T. BENNETT** |
| **CRAIG BRYANT,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (Attempted Murder & |
| | ) | Aggravated Assault) |

## ON APPEAL FROM THE JUDGMENT OF THE
## CRIMINAL COURT OF SHELBY COUNTY

FOR THE APPELLANT:

A.C. WHARTON
Public Defender

WALKER GWINN
Assistant Public Defender
201 Poplar Avenue
Memphis, TN 38103

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

DOUGLAS D. HIMES
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243-0493

WILLIAM GIBBONS
District Attorney General

LEE V. COFFEE
Assistant District Attorney General
Criminal Justice Complex, Suite 301
201 Poplar Avenue
Memphis, TN 38103

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# OPINION

The Defendant, Craig Bryant, appeals as of right from a Shelby County jury verdict convicting him of aggravated assault and attempted second degree murder. The trial court sentenced him as a Range I standard offender to consecutive sentences of three years for aggravated assault and ten years for attempted second degree murder. The Defendant now appeals pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. We affirm the judgment of the trial court.

The Defendant presents six issues on appeal: (1) whether the criminal attempt statute is applicable to the crime of second degree murder; (2) whether the trial court erred by failing to charge the jury that the Defendant could not be found guilty of attempted second degree murder unless he acted with the intent to kill Casondra Bryant; (3) whether the evidence is sufficient to support the Defendant's conviction for aggravated assault on Jenitra Stone; (4) whether the trial court erred by instructing the jury on the doctrine of transferred intent; (5) whether the trial court erred by allowing Stacy Muncey, a witness for the prosecution, to testify about statements made to her by Casondra Bryant concerning the Defendant's previous abusive behavior towards Bryant; and (6) whether the trial court erred by ordering the Defendant's sentences for aggravated assault and attempted second degree murder to run consecutively.[1]

The Defendant and Casondra Bryant, one of the two victims in this case, were married in 1993 in Memphis, Tennessee. The Defendant began working

---

[1] For purposes of clarity and brevity, we have consolidated some of the issues presented.

as a truck driver for M.S. Carriers in 1994, and his wife began working as an adult entertainer at Tiffany's Cabaret in 1996. Bryant[2] testified that during the month of March in 1996, she moved in with a friend for about two weeks and also took up residence at The Memphis Inn, a hotel. She stated that she was "[t]rying to get away from [the Defendant]" because he was "stalking" her and had been abusing her for some time. She testified that she was forced to move approximately once a week during March in order to avoid the Defendant. She reported that the Defendant followed her everywhere and was always able to discover where she moved, despite her efforts at secrecy.

At trial, Bryant recalled several encounters with the Defendant leading up to the incident which gave rise to the Defendant's present convictions. The first encounter that Bryant reported occurred on March 11, 1996 at approximately 3:30 a.m. when she arrived at The Memphis Inn parking lot after work. She testified that as she was getting out of her car, she saw a man running toward her with something in his hand. Realizing that it was the Defendant, she got back into the car, but, according to her testimony, the Defendant "busted [her] window," jumped in her car, and struck her on the back with a crowbar. He then took the car and drove it to North Carolina, where his parents lived. Following this incident, Bryant filed for divorce from the Defendant on March 15, 1996 and requested a restraining order against him.

Bryant also testified that on April 1, 1996, around one o'clock in the afternoon, she was sitting in her car in the parking lot of MegaMarket, waiting for

_____

² For the remainder of this opinion, Casondra Bryant will be referred to as "Bryant," and Craig Bryant will be referred to as "the Defendant."

a friend to run an errand inside the store.  She testified that the Defendant appeared and got into her locked car, using a second set of keys to the car. She stated that the Defendant pointed a gun at her and said, "This is the only way I can talk to you." She reported that she then fled the car and ran into the store for help.

According to Bryant, her next confrontation with the Defendant took place on April 3, 1996.  Between noon and two o'clock in the afternoon, Bryant and a friend, Stacy Muncey, were entering Tiffany's Caberet to eat lunch at a buffet inside the club.  Bryant testified that when she and Muncey got out of the car, the Defendant pulled into the parking lot behind them.  Bryant stated that she yelled, "Stacy, run," and the two girls ran inside the club to call the police.

Stacy Muncey verified this story.  Muncey also testified that she helped Bryant move a number of times to get away from the Defendant and that the Defendant continually called her to determine Bryant's whereabouts.  She further testified that Bryant was afraid of the Defendant and "feared for her life."  In addition, she reported seeing a large bruise on Bryant's back after the incident on March 11, 1996, when Bryant claimed to have been hit with a crowbar.

The incident from which the Defendant's present convictions arose occurred on April 4, 1996.  Bryant reported that five minutes after arriving at her hotel room that afternoon, she received a telephone call from the Defendant, who told her that he wanted to talk to her.  She stated that she had not given the Defendant the name of her hotel or her phone number. Upon realizing that the call was from the Defendant, she immediately hung up the phone and called

Muncey, who advised her to leave the hotel room. Bryant quickly showered and left approximately fifteen minutes later, fearful that the Defendant would come to the hotel. She then got into her car and drove to a nearby McDonald's restaurant.

Bryant described the incident as follows: While ordering food at the speaker for the "drive-thru" line at McDonald's, she heard a noise. When she turned, she realized that the Defendant was in her car holding a gun.[3] The Defendant told her if she said anything, he "would blow [her] f__king head off." A police officer who interviewed Bryant after the incident testified that Bryant reported to him that the Defendant also told her "if he couldn't have her nobody else could." In response, Bryant drove forward to avoid the drive-thru speaker blocking her door, unlocked her door, and turned around to retrieve her pocketbook. During the time that she was trying to get out of the car, the Defendant was grabbing her, pulling her hair, and striking her with his fist. When she grabbed her pocketbook, the Defendant shot her and then began to try to pull her out of the car while she held onto the steering wheel. She later recounted that she developed a bruise on her chest and shoulder from trying to hold onto the wheel. At this point, someone said, "Police," and the Defendant ran, dropping the keys to the car. Bryant then put the car into gear and drove onto the street. She spotted a police officer, stopped the car on the median, and got out. Other witnesses present at McDonald's on April 4, 1996 essentially verified Bryant's version of the shooting. However, no one actually saw who fired the gun.

---

[3] Bryant testified that she believed the Defendant got into her locked vehicle by using an extra set of car keys which he kept for the vehicle.

Jenitra Stone, the second victim in this case, was working as a cashier on April 4, 1996 at the drive-thru line at McDonald's. She testified that she saw a car, later identified as that belonging to Bryant, pull up to the window. Inside the car, she saw a woman with blood all over her face screaming for help as a man in the car beat her, hit her, and pulled her hair, parts of her body and clothes. At trial, Jenitra identified the woman as Bryant and the man as the Defendant. She stated that the Defendant appeared to be trying to pull Bryant out of the car while Bryant, who was holding onto the driver's-side door, appeared to be trying to get out of the car. Upon seeing this struggle, Jenitra testified that she turned to get her manager, and as she did so, she heard a loud noise and the shattering of glass, and she ducked. It was later determined that when Bryant was shot, the bullet entered the left side of Bryant's head and exited her head above her eye near her left eyebrow, about an inch away from its place of entrance. The bullet then traveled outside Bryant's car, shattered the drive-thru window, and hit Stone's cap, knocking it off of her head. Stone was treated for cuts and abrasions on her face caused by glass from the shattered window.

At trial, Stone stated, "[A]t the time, I didn't know that the cap was knocked off my head. I was more afraid when the glass shattered." She further testified, "I was shocked. At the time I didn't really think anything. I was still wondering what was going on." On cross-examination, in response to whether she was afraid at the time of the shooting, she stated she was not afraid because she "didn't know what was going on." However, on redirect, Stone admitted that she was afraid when she heard the bullet come through the window.

After the shooting, Bryant was taken to the emergency room at the Regional Medical Center for treatment. She was released from the emergency room on the same night.[4] A custodian of medical records at the hospital testified at trial that Bryant's records indicated she was treated in the emergency room by a surgery resident for a gunshot wound to the left eye. Records from follow-up visits to the hospital indicated that while Bryant's vision in her right eye was 20/20, vision in her left eye deteriorated to 20/50 by February 13, 1997.

Stacy Muncey picked up Bryant from the hospital to take her home. She and Bryant each testified that as they were leaving the hospital, they saw the Defendant in the waiting area. They reported that when they screamed for help from the security guard, the Defendant ran.

Officers Ronnie Elrod and Shannon Bowen of the Memphis Police Department were on patrol on the evening of April 8, 1996. They each testified that during their shift, they noticed a white Buick Regal bearing North Carolina tags[5] pull out of the parking lot of a hotel with the headlights off. They stopped the driver of the car for driving without lights and asked the driver, later determined to be the Defendant, for identification. When the Defendant did not produce identification, the officers asked his name and date of birth. The officers testified the Defendant told them that his name was Eric Bryant and that his date of birth was February 14, 1968.[6] The officers then escorted the Defendant to the

---

[4] Hospital records indicated that Bryant was scheduled for surgery at the Regional Medical Center, but she was never admitted to the hospital.

[5] The car belonged to the Defendant's mother.

[6] Eric Bryant is the Defendant's brother.

back of their police vehicle and ran a check on him and the car. The report, which was broadcast on the police radio within hearing distance of the Defendant, who remained in the back of the police vehicle, informed the officers that the car was the suspect vehicle in a recent shooting. The dispatcher also reported that the suspect involved in the incident was a man by the name of Craig Bryant. The officers testified that upon hearing this information, the Defendant admitted that he was Craig Bryant and provided a different date of birth, which turned out to be his true date of birth. The officers placed the Defendant under arrest. The officers then searched the Defendant's vehicle and found a loaded .380 semi-automatic chrome pistol under the driver's seat, as well as "three live rounds laying in the front floorboard" and "one live round in [the Defendant's] pocket."

At trial, Delphia Marlow Bryant, the Defendant's mother, testified that she owned the gun used to shoot Casondra Bryant. She recalled that she loaned the gun to Bryant in 1994 because Bryant wanted to protect herself while her husband was frequently on the road driving trucks. She stated that no one was present at the time she gave the gun to Bryant and that no one was aware of the exchange.

The Defendant also testified at trial. He stated that he never hit his wife with a crowbar, nor had he ever hit his wife, although he admitted that he did take her car and drive it to North Carolina. He explained that he had access to the car because he maintained a second set of keys to the vehicle. He claimed that the car, as well as the rest of their possessions, belonged to both him and his wife; and he claimed that they each made payments on the vehicle. He explained that

his wife's name alone appeared on the car title because they had agreed to buy their next vehicle in his name. Furthermore, he testified that he never pulled a gun on Bryant in the MegaMarket parking lot; in fact, he claimed not to have even been in the city of Memphis on April 1, 1996, the date of the alleged incident. In addition, apparently to discredit his wife's testimony, the Defendant testified that his wife regularly used drugs during the course of their marriage.

With regard to the day of the shooting, the Defendant testified that he and his wife had arranged to meet at their storage unit. He maintained that he was to page his wife on her pager when he was ready to meet. The Defendant stated that before paging her, he drove to Sam's Wholesale Warehouse, located behind McDonald's, to run an errand for a friend. He testified that while in the Sam's parking lot, he happened to notice Bryant's car in the McDonald's drive-thru line. According to the Defendant, he walked to her car, tapped twice on the window, opened the door, which was not locked, and got inside. He testified that they then spoke amicably and agreed to go to their storage unit together after she received her food order.

However, the Defendant claimed that instead of waiting for her food, Bryant pulled forward, told him she would get food later, and suddenly slammed on her brakes when the car sat beside the drive-thru window. The Defendant testified that his head hit the windshield, and when he turned to look at his wife, she was holding a gun pointed at him. He testified that she stated, "Get out," and he asked her, "Have you lost your mind?" He reported that as he asked this question, he made a fist to knock the gun away from him and hit the gun, which

angled up towards the roof of the car and fired a shot.[7] He testified that Bryant then told him, "Baby, I think I'm shot," and he began to scan her body for blood. Despite testimony from witnesses present at McDonald's at the time of the shooting that "there was quite a bit of blood" and that Bryant was "covered with blood," the Defendant testified that he noticed only one drop of blood on his wife's left shoulder. He stated that he then began to try to help her into the passenger's seat so that he could drive her to the hospital. However, she became hysterical and began screaming, "Just leave," so he got out of the car, taking the gun with him so that she would not shoot herself or him, and went back to his car. He denied ever hitting Bryant while in the drive-thru line. He also denied going to the Regional Medical Center later that evening, claiming instead that he went to another Memphis area hospital to look for his wife but left when he was unable to find her.

The Defendant also presented a different version of his arrest. He admitted that he was not carrying identification on the evening of April 8, 1996, but he denied ever having told the police that his name was Eric. In fact, he recalled that a police officer asked, "You're Eric Bryant?" and when he denied this, the officer "kept saying, 'Yes, you are.'" In addition, the Defendant insisted that the officers did not find the pistol used in Bryant's shooting on the floorboard under his seat, but rather in a briefcase in the trunk of his car. He claimed that the gun was not loaded. Finally, he reported that the headlights on his car were not off at the time he was stopped.

---

[7] The Defendant testified that he was unsure what happened after he "hit the gun upwards" or how the bullet hit his wife in the head. At one point, he stated, "[w]hen the gun hit the roof of the car, that's when I heard the shot go off. So simultaneously whenever this gun hit the roof of the car, at some point in time between the roof of the car it simultaneously went off hitting her in the side of the head."

# I.  ATTEMPTED SECOND DEGREE MURDER

## A.  *Validity of the Crime Charged*

The Defendant first contends that the Tennessee criminal attempt statute, codified at Tennessee Code Annotated § 39-12-101, should not apply to the crime of second degree murder, codified at § 39-13-210.  He points to the fact that the attempt statute requires one to act with a specific <u>intent</u> to cause the result of the crime attempted; stated differently, he argues that an attempt is merely a failure to do what one <u>intended</u>.  He argues that this statute therefore may not be reconciled with the second degree murder statute because <u>intent</u> to kill is not an element of the offense of second degree murder; rather, the second degree murder statute simply requires a <u>knowing</u> killing.

As a preliminary matter, we note from a reading of the record that the Defendant has failed to include this issue in his motion for new trial.  The State contends that this issue is therefore waived.  However, "[i]ssues which, if meritorious, would mandate a dismissal may still be considered, even though not listed in the motion for a new trial." <u>State v. Sowder</u>, 826 S.W.2d 924, 926 (Tenn. Crim. App. 1991); <u>see also</u> Tenn. R. App. P. 3(e).  Because we believe that a successful disposition of this argument would result in dismissal of the charge against the Defendant for attempted second degree murder, rather than a new trial, we will proceed to address this issue on the merits.

Our legislature has defined second degree murder as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1).[8] Knowing, in turn, is defined as referring to

> a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Id. § 39-11-302(b).

"A person commits an attempted second-degree murder when he knowingly acts with the intent to kill his target and his actions constitute 'a substantial step toward the commission' of the murder." State v. Frederick R. Porter, No. 03C01-9606-CC-00238, 1997 WL 661419, at *3 (Tenn. Crim. App., Knoxville, Oct. 24, 1997) (citing Tenn. Code Ann. 39-12-101(a)(3)). "Conduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." Tenn. Code Ann. § 39-12-101(b).

The primary case upon which the Defendant relies in arguing that the crime of attempted second degree murder does not exist in Tennessee is State v. Kimbrough, 924 S.W.2d 888 (Tenn. 1996). We believe that Kimbrough is distinguishable from the present case. In Kimbrough, the Tennessee Supreme Court concluded that "one cannot intend to accomplish the unintended" and therefore determined that "the offense of attempted felony-murder does not exist in Tennessee." Id. at 892. However, unlike the crime of felony-murder, which

---

[8] Tennessee Code Annotated § 39-13-210(a)(2) also presents a second type of second degree murder which is not at issue in the case at bar. Tenn. Code Ann. § 39-13-210(a)(2).

requires no culpable mental state, Tenn. Code Ann. § 39-13-202 (a)(2);[9] the crime of second degree murder requires that one act knowingly. One commits second degree murder if one knowingly tries to kill another and succeeds in doing so. However, if one does not succeed, and his or her actions constitute a substantial step toward the commission of the killing, he or she is guilty of attempted second degree murder. We conclude that Tennessee's attempt statute is applicable to the offense of second degree murder.

In the case at bar, the State presented evidence from which the jury could conclude that the Defendant entered Casondra Bryant's car carrying a gun and that he subsequently shot his wife in the head. Furthermore, we believe that it was well within the purview of the jury to conclude that the Defendant acted with the awareness that this conduct was reasonably certain to cause his wife's death. However, because his wife was not killed, but rather seriously injured, we believe that the jury could reasonably have determined that the Defendant is guilty of attempted second degree murder.

### B. Jury Instruction

The Defendant also argues that the trial court erred by failing to charge the jury that the Defendant could not be found guilty of attempted second degree murder unless he acted with an intent to kill Casondra Bryant. We will address the issue even though Defendant has failed to include this issue in his motion for new trial. The jury was instructed, pursuant to T.P.I. - Crim. 4.01 (4th ed. 1995), that the defendant must have "intended to commit the specific offense of Murder

---

[9] Except, of course, the intent to commit the underlying felony.

-13-

Second Degree" and "did some act intending to complete a course of action or cause a result that would constitute Murder Second Degree..." This was a proper instruction. See State v. Eldridge, 951 S.W.2d 775, 779 (Tenn. Crim. App. 1997). This issue is without merit.

## II. AGGRAVATED ASSAULT

### A. Sufficiency of the Evidence

The Defendant next contends that the evidence is insufficient to uphold his conviction for aggravated assault against Jenitra Stone. He argues that he had no intent to assault Stone or to put her in fear of imminent bodily injury, nor were there any "circumstances from which it can be inferred that he was aware that any conduct on his part would be reasonably certain to put Stone in fear of imminent bodily injury." He suggests that the only person whom he could have been found guilty of intending to harm is his wife, Casondra Bryant. Thus, he argues that he could be found guilty of aggravated assault against Stone only through the doctrine of transferred intent. He contends that the doctrine of transferred intent is inapplicable to assault cases in Tennessee.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[findings] of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact beyond a reasonable doubt." Tenn. R. App. P. 13(e). "Questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this Court." State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). Nor may this Court re-weigh

or re-evaluate the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978)).

A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982) (citing Cabbage, 571 S.W.2d at 835). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. McBee v.State, 372 S.W.2d 173, 176 (Tenn. 1963); see also Evans, 838 S.W.2d at 191 (citing Grace, 493 S.W.2d at 476); Tuggle, 639 S.W.2d at 914.

In the present case, the Defendant was charged with "intentionally commit[ting] an assault on Jenitra D. Stone . . . by use of a deadly weapon . . . caus[ing her] to reasonably fear imminent bodily injury." Thus, the following portion of the Tennessee assault statute is at issue here: "A person commits assault who . . . [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury . . . ." Id. § 39-13-101(a)(2). In addition, the following portion of our aggravated assault statute is at issue: "A person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and . . . [u]ses or displays a deadly weapon . . . ." Id. § 39-13-102(a)(1)(B).

In making the argument that his conviction for aggravated assault may only be upheld by a finding of transferred intent, the Defendant fails to note the <u>mens era</u> of "knowing" in the statutes cited above. The aggravated assault statute plainly states that a Defendant may be found guilty of the crime of aggravated assault if he acts "intentionally <u>or knowingly</u>." <u>Id.</u> (emphasis added). Because a conviction for aggravated assault does not require a finding of specific intent, we need not address the question of whether the doctrine of transferred intent is applicable to the crime of aggravated assault. To sustain an aggravated assault conviction, it is enough for a jury to find that a defendant acted knowingly. As previously stated,

> a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a

result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Id. § 39-11-302(b).

In this case, the State presented evidence from which the jury could infer that Stone reasonably feared imminent bodily injury at the time of the shooting. Stone herself testified that she was "shocked" by the incident and afraid when she heard the bullet come through the window. Moreover, the State presented evidence from which the jury could infer that the Defendant knowingly caused Stone to fear imminent bodily injury. The State presented evidence that the Defendant entered his wife's car with a loaded gun, pointed the gun at his wife, and fired the gun while the car was beside the drive-thru window of a restaurant. We find this evidence sufficient to support the conclusion that the Defendant acted with the awareness that his conduct was reasonably certain to cause others, including Stone, the cashier at the drive-thru window, to fear imminent bodily injury.

*B. Jury Instruction*

The Defendant next argues that the judge committed plain error by instructing the jury on the doctrine of transferred intent. Again, we note that this issue was not raised in the Defendant's motion for new trial, thus waiving the issue on appeal, see Tenn. R. App. P. 3(e); but we will briefly address the Defendant's argument. The contested instruction is as follows:

> Under a doctrine known as "transferred intent" a crime may be aggravated assault when the person assaulted could have been killed and was not the one whom the accused intended to kill or injure such as where one shooting [sic] at another and kills or assaults a bystander or third person coming within range.
>
> However, before the jury may find the defendant guilty of the offense of aggravated assault or any included class of assault, you must be satisfied beyond a reasonable doubt that the assault of

Jenitra D. Stone was aggravated assault or any included class of assault and was committed by the defendant.

Jury instructions on the doctrine of transferred intent, such as that above, are appropriate in cases involving crimes in which specific intent is an element. As we have already concluded, the crime of aggravated assault does not require specific intent. Although in some cases, specific intent may be an element of the crime, the Defendant in the present case must only have acted knowingly. For this reason, we find the foregoing instruction unnecessary.

We conclude, without addressing the merits of the Defendant's argument concerning transferred intent, that any error possibly caused by this instruction was clearly harmless error. The instruction is worded in very general terms and does not require that the jury utilize the doctrine of transferred intent to convict the Defendant of aggravated assault, allowing the jury to convict based upon the statutory definition of aggravated assault, which requires only that the Defendant act knowingly.

Moreover, had the jury relied upon the foregoing instruction to convict the Defendant of aggravated assault, the result would have been no different than if the jury simply relied upon our aggravated assault statute to convict. The transferred intent instruction in this case required the jury to find specific intent, which is a greater state of mental culpability than the mens era of knowing. Thus, if the jury relied on the transferred intent instruction, the jury necessarily must have found that the Defendant acted at least knowingly. This issue is therefore without merit.

## III. HEARSAY OBJECTION TO TRIAL TESTIMONY

The Defendant argues that the trial court erred in admitting, over objections by defense counsel, certain testimony by Stacy Muncey. Specifically, Muncey testified that Casondra Bryant told her "that Craig was stalking her, that she needed to hide, that he kept finding her and calling [her hotel] room." She stated that Casondra "feared for her life." She also testified that Casondra told her the Defendant "hit her with a crowbar," causing a "large bruise [to form] on her back." The Defendant contends that this is highly prejudicial hearsay testimony which should have been excluded at trial.

Although it is somewhat unclear from the record, it appears that the trial judge allowed at least part of this testimony under the "excited utterance" exception to the hearsay rule. See Tenn. R. Evid. 803(2). From a reading of the record, we agree with the Defendant that this testimony appears to be hearsay. Furthermore, it appears that the record does not support the State's contention that the testimony fits into one or more of the exceptions to the hearsay rule. See generally Tenn. R. Evid. 803. However, in light of other testimony presented at trial and the entire record before us, including Casondra Bryant's testimony to the same effect as that of Muncey, we are satisfied that admission of Muncey's testimony was harmless error. Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

## IV. SENTENCING

Finally, the Defendant argues that the trial court improperly ordered his sentences for attempted second degree murder and aggravated assault to be served consecutively. The trial court ordered consecutive sentencing after determining that the Defendant is a dangerous offender.

When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is ?conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In conducting a de novo review of a sentence, this court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987); Tenn. Code Ann. §§ 40-35-102, -103, -210.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

Tennessee Code Annotated § 40-35-115(b)(5) provides that a trial court "may order sentences to run consecutively if the court finds by a preponderance of the evidence that . . . [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high . . . ." Tenn. Code Ann. § 40-35-115(b)(4). This rule, which is based upon cases decided by the Tennessee Supreme Court prior to its codification, see, e.g., State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), has been expanded through case law. In Gray v. State, 538 S.W.2d 391 (Tenn. 1976), our supreme court determined that "[t]he decision to impose consecutive sentences when crimes inherently dangerous are involved should be based upon the presence of aggravating circumstances and not merely on the fact that two or more dangerous crimes were committed." Id. At 393. In addition, the sentencing terms imposed must be "reasonably related to the severity of the offenses committed and [must be] necessary in order to protect the public from further criminal acts by the offender." Wilkerson, 905 S.W.2d at 938. The purpose of consecutive sentencing is to "protect society from those who are unwilling to lead a productive life and resort to criminal activity in furtherance of their anti-societal lifestyle." Gray, 538 S.W.2d at 393. However, our supreme court has also recognized that "'sentencing is inescapably a human process that neither can nor should be reduced to a set of fixed and mechanical rules.'" Wilkerson, 905 S.W.2d at 938 (citing 3 American Bar Association Standards for Criminal Justice, Sentencing Alternatives and Procedures 18.11 (2 ed. 1986)).

In the case before us, the trial judge made the following observations at the sentencing hearing:

The Court notices in this case the background. Apparently, . . . [Casondra Bryant] moved on several occasions trying to hide out so [the Defendant] wouldn't locate her because apparently [their] altercations would result in violent activity. And the defendant would find her the several times that she moved.
. . . .
And so the Court has to take that into consideration and this continuous stalking when she was trying to stay away from him. . . .
. . . .
The defendant has a previous history of criminal convictions or criminal behavior in addition to that necessary to establish the range. The defendant did have some previous criminal offenses and some assaults that were either nol-prossed [sic] or dismissed. And the Court has to consider the prior criminal behavior in this situation.
. . . .
Looking at this defendant over the period of time that we have facts concerning the defendant, the defendant denies that he did anything that was dangerous or would be a dangerous offender. But according to the victim, he did several things. In fact, she was injured and had to get treatment for it. So that's a dangerous offender.

If you believe the victim that . . . she was struck with a tire tool on that one occasion and a baseball bat on another, that's certainly a dangerous person in my opinion. And a person, also, who pulls up a gun and fires it out in a public area trying to hurt the victim, that's a dangerous person. The Court will allow that to apply in regard to consecutive sentencing. . . .

[T]he Court rejects the fact . . . that [the defense] is saying that this is a single course of conduct that led to the injury. It was a single course of conduct. But when you fire a gun that conduct is not restricted to one or two individuals. A bullet is not restricted except by physical things that will prevent a bullet from going any further. . . .

But in this case it was fired and ended up going through a window where it almost struck the lady and could have easily hit someone else in that place of business because . . . that window [was] open.

The record clearly supports the trial court's finding that the Defendant is a dangerous offender. He discharged a gun in a fast-food restaurant drive-thru lane, a public place which is typically crowded, thus jeopardizing the lives of several people, including that of his wife who he shot in the head.[10] Moreover,

---

[10] The jury, by its conviction of the Defendant, accredited this version of the shooting.

-22-

the bullet narrowly missed striking Jenitra Stone; and had she been hit, it is quite possible that she could have been killed. Giving deference to the findings of the trial court, whose sentencing determination is presumed to be correct, we agree with the decision that the sentences should run consecutively in order to protect the public from further serious criminal conduct by the Defendant.

Furthermore, for his attempted second degree murder conviction, the Defendant was sentenced to a term in the middle of the sentencing range for a Class B felony, and for his aggravated assault conviction, he was sentenced to the minimum term for a Class C felony. We cannot say that the aggregate length of his sentences, which is only one year more than the maximum sentence for the crime of attempted second degree murder standing alone, is excessive. Noting that attempted second degree murder is among the most severe offenses that can be committed, we find that the terms of imprisonment reasonably relate to the severity of the offenses. We therefore conclude that the record provides ample evidence to justify the sentences imposed in this case.

The judgment of the trial court is accordingly affirmed.

_____
DAVID H. WELLES, JUDGE


CONCUR:


_____
PAUL G. SUMMERS, JUDGE

_____
JOE G. RILEY, JUDGE